STATE OF MAINE                                    SUPERIOR COURT
SAGADAHOC, ss.                                    CRIMINAL ACTION
                                                  Docket No. CR-02-73
                                                  TDW -SAG - 3/14/2012

STATE OF MAINE,

v.                                                ORDER

OLLAND REESE,

         Defendant.

Before the court is a motion for a new trial by Olland Reese, who was convicted

of the murder of Cody Green in July 2003. Reese's motion is brought pursuant to 15

M.R.S. § 2138(10) based on DNA evidence obtained after trial.


    1. Procedural History

    Cody Green was last seen alive on May 26, 2002, when a cabdriver dropped her

off at a residence in Bowdoin, Maine, where Olland Reese was living.  Green was

reported missing three days later.  Her body was found on June 25, 2002, buried in

woods on property adjoining Reese's residence.

    Olland Reese was indicted for the murder of Cody Green on July 9, 2002.  He was

convicted of that crime on July 23, 2003, and his conviction was affirmed by the Law

Court on June 30, 2005.  *State v. Reese*, 2005 ME 87, 877 A.2d 1090.  Thereafter, Reese

filed a petition for post conviction review on June 29, 2006.  That petition was denied on

February 27, 2009, and the Law Court thereafter declined to grant a certificate of

probable cause for appeal.

    Reese originally filed a motion for DNA analysis under 15 M.R.S. § 2137 on June

27, 2008.  That motion followed certain post trial DNA analysis that had already been

performed in May 2008 in connection with Reese's petition for post conviction review.[1] Reese originally sought consolidation of his post trial DNA motion with his pending post conviction proceeding. While counsel and the court initially agreed with this proposal, the court subsequently ordered that the post conviction hearing – then scheduled for October 2008 – would be limited to the issues raised in the post conviction proceeding and that the court would thereafter address the post trial DNA motion. *See* order dated September 29, 2008 and 15 M.R.S. §2138(12).

A hearing on Reese's post conviction petition was held in October and November 2008. After the petition for post conviction relief was denied, counsel for Reese turned back to Reese's post trial DNA motion and requested that certain additional items be subject to DNA testing. That request was granted in part and denied in part by order dated July 13, 2009. In particular, the court ordered further testing of a portion of the duct tape that had been found around Cody Green's wrists and allowed the defense to designate two other areas on the duct tape to be tested.

Because the Crime Lab was backed up with requests for DNA testing during the second half of 2009 and the first half of 2010, the DNA analysis that had been ordered took place during the summer and fall of 2010 and resulted in a report dated December 22, 2010.[2]

---

[1] In that petition Reese ultimately focused on the claim that his trial counsel had been ineffective in failing to adequately investigate and offer DNA evidence and expert testimony with respect to duct tape that was found wrapped around Cody Green's wrists when her body was discovered. The procedural history leading to the DNA testing and the facts relevant to Reese's post conviction claim are set forth in the court's order denying Reese's petition for post conviction relief, *Reese v. State*, CR-06-125, order dated February 27, 2009 and docketed on March 4, 2009 (Superior Court, Sagadahoc), which is incorporated herein by reference.

[2] By agreement of counsel, all of the reports generated by the Crime Lab were admitted as evidence on the new trial motion even though they were not individually marked at the hearing.

On January 25, 2011, learning that the defense had not yet designated the additional areas to be analyzed on the duct tape, the court issued an order directing the defense to make its designation within 60 days. On March 23, 2011 the defense made its designations, which the State objected in part as overbroad.[3] At a telephone conference on June 2, 2011 the defense clarified its request and the court ordered further testing. *See* order dated June 2, 2011. As a result of that order, two large area swabs – one from the entire adhesive side of the duct tape and one from the smooth side – were subjected to DNA analysis. This resulted in a DNA match to Cody Green but no other DNA profile, either using PCR analysis or YSTR analysis. *See* Crime Lab report dated July 8, 2011.

A hearing on Reese's motion for a new trial based on DNA evidence was held on October 21, 2011. At that hearing it was agreed that the court could consider the original trial record, the entire post conviction record, and all of the crime lab and other expert reports generated from the outset of the case up to the date of hearing, including the September 23, 2011 report from defense expert Greg Hampikian, Ph.D. and the October 4, 2011 report of Forensic DNA Analyst Cathy MacMillan. The court also heard testimony from Hampikian and MacMillan at the October 21, 2011 hearing.

After the hearing, the parties submitted certain reports and other exhibits to complete the record. As of early November the record was complete, and the court has since reviewed the entire record of the original 13-day trial and the exhibits admitted at trial in order to evaluate the DNA evidence relied upon by Reese in light of the entire body of evidence.

---

[3] At that time the State did not object to the defense's request for testing of certain hairs that had been found to be potentially suitable for DNA analysis, but those were subsequently found to have an insufficient amount of DNA to produce interpretable DNA profiles. *See* May 12, 2011 Crime Lab report.

3

2.    Governing Statute

Under 15 M.R.S. §2138 (4-A) a court shall order post-trial DNA analysis if a defendant presents *prima facie* evidence (1) that a sample of the evidence is available for DNA analysis; (2) that the evidence has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered; (3) that the evidence was either not subjected to DNA analysis or can be subjected to DNA technology that was not available when the person was convicted; (4) that identity of the perpetrator was an issue at trial; and (5) that the evidence to be analyzed is material to the issue of whether the defendant is the perpetrator of the crime.

The Law Court has found that the *"prima facie"* standard in § 2138(4-A) is a relatively low standard that requires some evidence on each of the required elements but reserves final determination on the reliability and credibility of the evidence in question to a subsequent time. *Cookson v. State*, 2011 ME 53 ¶8, 17 A.3d 1208, 1211-12. In this case, in considering the issues at the *prima facie* stage, the State contested only whether the YSTR technology had been already available at the time of trial. The court ruled for Reese on that issue in its July 13, 2008 order.

At this stage of the proceeding, pursuant to 15 M.R.S. § 2138(10), the court must now determine whether Reese has shown "by clear and convincing evidence" either

(1)  that only the perpetrator of this crime for which Reese was convicted could be the source of the DNA result on which he relies and that the DNA result, considered with all the other evidence in the case, shows that Reese is actually innocent, 15 M.R.S. § 2138 (10)(A);

(2)  that only the perpetrator of this crime for which Reese was convicted could be the source of the DNA result on which he relies and that the DNA test result, when considered with all the other evidence in the case, would make

4

it probable that a different verdict would result upon a new trial; 15 M.R.S. § 2138(10)(B); or

(3) that the DNA test result, when considered with all the other evidence in the case, would make it probable that a different verdict would result upon a new trial, and

   (a) the proffered test result was discovered after trial;

   (b) the DNA test result could not have been obtained prior to trial by the exercise of due diligence;

   (c) the DNA test result is material to the identity of the perpetrator; and

   (d) the DNA result is not merely cumulative and impeaching. 15 M.R.S. § 2138(10)(C).

3.   Evidence at Trial

In order to consider the DNA result relied upon by Reese in context, it is necessary to first review the other evidence offered in the case. The most probative evidence offered at trial, which the court finds to be highly credible, may be summarized as follows:

In May 2002, Olland Reese was 19 years old. At that time he was living in a trailer home in Bowdoin, Maine owned by his mother, Trudy Bither. Reese was living in that residence with his 15-year-old girlfriend, Kara McGinnis. McGinnis, who was on juvenile probation, had been permitted to stay at the Bither residence in Bowdoin under an arrangement where she was supposed to be residing with Bither but not to have any contact with Reese. Although Reese was purportedly staying in Old Orchard Beach, his mother was allowing Reese to reside with McGinnis at the Bowdoin residence in disregard of the court-ordered no contact provision.

5

Cody Green was a good friend of Kara McGinnis, but Reese strongly disliked Green. He told McGinnis that Green was a "slut," that she was "bad news," and that he did not like the way McGinnis acted when she was with Green. Reese did not want McGinnis to spend time with Green and at one point he told McGinnis that Green had made a sexual advance toward him, which Green denied.

On the Friday of Memorial Day weekend, May 24, 2002, Trudy Bither and the man she was then dating left to go to Rhode Island for the weekend, leaving Reese and McGinnis at the Bowdoin residence. On the following day, Green stopped by the Bowdoin residence on two occasions to see McGinnis. On one of those visits Green arranged to obtain some cocaine, and she gave $50 to Reese for that purpose with the understanding that he would provide her with the cocaine the following day.

On the following day, Sunday May 26, Green spent the morning with her mother in Brunswick. Sometime that afternoon she told her mother she was going out to Kara's house. Green took a taxi to the Bowdoin residence in the late afternoon. When the cab driver dropped her off, he observed that a young male came out to meet her. The male was accompanied by a puppy with distinctive markings – one light eye and one dark eye. The puppy belonged to Kara McGinnis. The puppy was not ordinarily allowed to be at the Bowdoin residence but had been brought over just for that weekend because Trudy Bither, who did not want the puppy at the residence, was away.

When Green was dropped off by the cabdriver at the Bowdoin residence, that was the last time that she was seen alive.

The State carefully established at trial that McGinnis had left the Bowdoin residence at approximately 4 p.m. on May 26 when her father picked her up to drive her

6

to Dionne Commons, a nursing home where McGinnis worked in the kitchen staff.[4] When McGinnis left for work at 4 p.m., Green had not yet arrived at the Bowdoin residence, and McGinnis did not know she was coming.

Reese remained behind at the Bowdoin residence when McGinnis left for work. McGinnis got a ride with her father because Reese and McGinnis did not have any vehicle available to them, and Reese did not have a license. McGinnis called Reese from work at around 5:15 p.m., and he told her he was taking a shower. By 6:15 or 6:30 McGinnis had finished her shift at Dionne Commons and got a ride (this time from her mother) back to the Bowdoin residence, arriving there at around 6:45.

Reese met McGinnis at the door and immediately asked McGinnis's mother if she could give the couple a ride to Wal-Mart in Brunswick. McGinnis's mother declined to do that, so Reese instead called a taxi to take them to Wal-Mart. Entering the Bowdoin residence before the cab arrived, McGinnis observed that the residence – which had been "trashed" and "very messy" when she left – was now neat and clean. She noted that the sheet on the futon where she and Reese had slept the previous night had been removed, and that a hatchet used to chop kindling for the woodstove was now outside. She also observed that Reese was acting "hyper," and she was puzzled that he wanted to go to Wal-Mart – ostensibly to buy shoes for McGinnis's brother, which McGinnis found odd.

Cody Green was not at the Bowdoin residence when McGinnis returned, and Reese did not say that she had been there. McGinnis was aware, however, that Reese had not obtained the cocaine for which Green had given him $50 a day before.

The taxi called by Reese arrived between 7:00 and 7:30 pm and took Reese and McGinnis to Wal-Mart. Later that evening, around 10 p.m. or so, Reese and McGinnis

---

[4] Green also worked at Dionne Commons but had not worked that day.

travelled back by taxi from Wal-Mart to the Bowdoin residence where they remained that night.

The following day, Monday May 27, McGinnis received a telephone call from a co-worker at Dionne Commons. The co-worker asked if McGinnis had seen or heard from Green, who had not shown up to work her morning shift at Dionne Commons. The co-worker understood that Green had gone out to the Bowdoin residence to see McGinnis. McGinnis told her she had not seen or heard from Green.

When Green did not reappear on that Monday, her friends and family started to become concerned about her whereabouts. On May 29 Green was reported missing to the Brunswick police. Over the succeeding month there were increasing efforts by law enforcement personnel to locate her.[5] McGinnis and Reese were eventually interviewed by the Brunswick police. In order to maintain the story that McGinnis was not having contact with Reese, she did not initially acknowledge that she and Reese had been together at the Bowdoin residence over the Memorial Day weekend.

For his part, Reese originally told the Brunswick police that he had been at Old Orchard Beach all weekend. Thereafter he got back in touch with the Brunswick police and asked to meet with Detective Inez Dudley. On June 21 he told Dudley that he had previously been trying to protect McGinnis from getting in trouble with probation but that he had actually returned from Old Orchard Beach on the afternoon of May 26 and was alone at the Bowdoin residence in the late afternoon when a taxi had dropped Green off. Reese said he told Green that McGinnis would be home shortly, but that Green told him she did not want to wait, and that she would visit friends and come back later. He said the last time he saw her, she had walked out of the driveway and

---

[5] Kara McGinnis also made efforts to find Green and began calling hospitals, which annoyed Reese, who expressed frustration with McGinnis's attempts and who told her Green was probably out "whoring around."

8

then turned left on Route 125 in the direction of Lisbon Falls. He said that he and McGinnis had spent that night at the Bowdoin residence but that he had gone back to Old Orchard Beach the following day.

Toward the end of June the State Police became involved in the missing person investigation. On June 23, Reese had a long interview with the State Police in Old Orchard Beach and essentially repeated the story he had told Detective Dudley – that Green had been dropped off by a taxi, stayed a few minutes, then left on foot.

On the following day, June 24, when detectives were interviewing Kara McGinnis, she received a cell phone call from Reese. She handed the phone to State Police Detective Erik Baker, who heard Reese screaming that Kara should not talk to detectives without a lawyer present.

On June 25, 2002 law enforcement personnel including several Warden's Service tracking dogs undertook a search of two areas: the area in Brunswick around Green's residence and the area in Bowdoin around the Bither residence where Green had last been seen on May 26. In Bowdoin the plan was to begin in the woods around the Bither residence and then search westward along Route 125 toward Lisbon Falls. Within 10 minutes one of the dogs found a pile of sticks and rocks with one sneaker visible, which proved to be where Cody Green had been placed in a shallow grave. The burial site was in the woods behind the Bither residence, approximately 350 to 400 feet from the residence itself. At that time, wardens who were experienced trackers observed a track of broken branches and some faint foot tracks from the burial site towards the Bither residence.

When Green's body was unearthed, her wrists were bound with duct tape that was consistent with a roll of duct tape found in the Bither residence.[6] Green's body was wrapped in a sheet which Kara McGinnis subsequently identified as the sheet which had been on the futon where she and Reese had slept on the night before Green's disappearance. This was the same sheet which had been removed from the futon by the time McGinnis returned to the Bither residence at approximately 6:45 p.m. on May 26. The condition of Green's body was consistent with death and burial having occurred a month previously.

The discovery of Green's body led to several searches of the Bither residence. In the second of those searches the State Police removed a fitted sheet that was on the futon and found bloodstains on the black futon cover that had soaked into the futon mattress. They also found a blood transfer stain on the wall in the back hallway near the door which led out the back of the trailer. That transfer stain was located approximately 4 and a half feet above the floor – approximately where someone carrying Green's body might have left a stain if a bloody sheet wrapped around her head had touched the wall while her body was being carried out of the residence.

Subsequent DNA testing demonstrated that DNA from both the bloodstain found on the futon cover and mattress and the bloodstain found on the hallway wall matched that of Cody Green. The medical examiner determined that Green had been killed by blunt force trauma to the head, and Green's DNA was found on the blunt end of the hatchet in the living room of the Bither residence which was used to cut kindling for the woodstove.

---

[6] Olland Reese's fingerprints were found on the roll of duct tape found in the residence. The parties stipulated, however, that the duct tape found on Green's wrists and the duct tape found in the residence was a type of duct tape commonly sold in Maine.

10

After Green's body was found, Reese was re-interviewed at the Brunswick Police station. Having originally said he was not present at the residence on that Memorial Day weekend and having then amended his story to state that a taxi had dropped Green off and she had left on foot, Reese now offered a third story – that he had not seen or talked to Green on May 26 but had looked out of the window to see a taxi backing out of the driveway of the Bither residence sometime in the late afternoon on that date.[7]

4. Duct Tape Evidence at Trial

As noted above, when her body was found, Green's wrists were wrapped with duct tape. The duct tape was designated as item No. 31 by the Crime Laboratory and offered as State's Exhibit 31 at trial. The Crime Lab reports refer to the duct tape as having been wrapped six times around Green's wrists, and the six wraps of tape were designated by the Crime Lab as items 31B-G, respectively.[8] However, a photograph of Green's body (State's Trial Ex. 24) demonstrates that, at least when her body was found, her wrists were wrapped approximately five times and that the remaining duct tape was a partially twisted trailing end.

A subsequent examination of the duct tape revealed a partial handprint on the inside (adhesive side) of the fifth wrap of duct tape (Item 31F) along an edge of the tape. State's Trial Exhibits 24 and 31 demonstrate that the smooth portion of the fifth wrap where the partial print was located was not covered by other tape when Green's body was found.

---

[7] That was the story he adhered to at trial. The jury could also have found, based on the evidence at trial, that after Green's body was found but before pertinent details of its condition had been made public, Reese made statements that included details that only the killer could have known.

[8] *See* inventory filed February 11, 2009.

The partial handprint was subjected to painstaking analysis by State fingerprint technician Kim Stevens, who testified that she spent between 50 and 100 hours examining the print. She determined that the print did not match Olland Reese.[9] One possible source of the print was Cody Green. However, despite various efforts, the State was unable to locate a set of Green's handprints for comparison, and her body was too badly decomposed to yield any prints for analysis.

Thereafter the area of the tape where the partial print was found was subjected to DNA analysis by State forensic analyst Cathy MacMillan. In order to obtain a DNA extract from the duct tape, MacMillan removed a 3.5 cm x 1.5 cm swatch of the duct tape, cut that swatch up, and placed the pieces in sterile tubes for DNA extraction. The resulting extracts were then combined and analyzed. The swatch subjected to DNA analysis thus included the adhesive side where the partial print was located, the other (smooth) side of the tape, and a portion of the edge of the roll.

From the DNA extracted, a partial DNA profile was obtained that was consistent (five loci) with fingerprint examiner Kim Stevens. This indicated that Stevens had somehow contaminated the area where the print was found with her DNA.[10] That finding was recorded in the Crime Lab's contamination log and was duly reported to defense counsel.

Among the items derived in DNA analysis are electropherograms which plot the results obtained in seeking a DNA profile. The electropherograms derived in the analysis of the swatch from Item 31F showed an indication that, in addition to the partial five-locus profile consistent with Kim Stevens, there was a trace amount of male

---

[9] It also did not match the persons whom Reese's trial counsel had proposed as alternate suspects.

[10] This could have occurred if she touched the area where the print was found or had otherwise transmitted some of her epithelial (skin cell) DNA to the print area.

12

DNA comprising what MacMillan later characterized as a "very small Y peak."[11] This amount was well below the threshold necessary for the Crime Lab to report any result. Prior to trial, copies of MacMillan's worksheets (including the electropherogram derived from the DNA testing of item 31F) were provided to the defense's forensic experts at the Henry Lee Institute at the University of New Haven.

As set forth in the court's February 27, 2009 order in Reese's post conviction proceeding, none of the defense experts – who had advised Reese's trial counsel that they were prepared to analyze the State's DNA evidence and had specifically requested the relevant electropherograms - made any mention of the possible Y peak or the trace amount of male DNA, nor did they request any further testing. Instead, they reported to Reese's trial counsel that the DNA evidence had been "competently analyzed."[12]

5. Additional DNA Evidence at Post Conviction Proceeding

During Reese's post conviction proceeding, a new defense expert suggested that the remaining extract from item 31F might yield further information if subjected to an additional form of DNA analysis known as YSTR analysis. YSTR analysis is a sophisticated kind of DNA analysis that was in its infancy at the time of trial but that had since become more widespread. YSTR testing only analyzes Y (male) chromosomes and is not as discriminating as the PCR testing that analyzes nuclear DNA. Although less effective at producing matches, YSTR testing sometimes yields results from a smaller sample than is required to obtain a PCR profile.

---

[11] The electropherogram in question was previously offered in evidence in CR-06-125 and was also admitted at the hearing on this motion as Defendant's Ex. 1. The Y peak, which would otherwise be difficult to discern, has been flagged on Defendant's Ex. 1.
[12] In the post-conviction case the court concluded that it was not ineffective for Reese's trial counsel to have relied on those defense experts. *See Reese v. State*, CR-06-125, order dated February 27, 2009 and docketed on March 4, 2009 (Superior Court, Sagadahoc) at 9-11.

YSTR analysis was conducted on the extract from item 31F during the spring of 2008 by an outside laboratory.[13] That analysis did not yield a profile that could be matched with any individual but it confirmed that there was male DNA present and that Olland Reese was excluded as the donor of that material.

### 6. DNA Evidence at Motion for New Trial

As noted above, after the court entered its February 27, 2009 order denying Reese's petition for post conviction relief, counsel for Reese turned his attention back to the instant motion for a new trial based on the result of the YSTR test. With one exception, none of the additional items that Reese also sought to have tested, *see* July 13, 2009 order, yielded any evidence that either party contended was relevant. The exception is the result of large area swabs conducted of the remaining duct tape, which the defense contends supports its motion for a new trial. DNA analysis of those swabs found a match with Cody Green but did not yield any other DNA profile.

At the October 21, 2001 hearing the defense called Greg Hampikian, a biology professor at Boise State University and a founder of the Idaho Innocence Project. Professor Hampikian testified that, in his opinion, the presence of a partial YSTR profile excluding Olland Reese from the print area on the duct tape led to the conclusion that an alternative perpetrator had murdered Cody Green. Professor Hampikian opined that it was likely that the latent print and the male DNA came from the same source and that its presence on the duct tape used to wrap Cody Green's wrists indicated that it had been left by the perpetrator of the crime. Professor Hampikian discounted the possibility that the partial YSTR profile resulted from contamination, largely because he

---

[13] At the time the Maine Crime Laboratory was not certified to perform YSTR analysis. It subsequently received that certification.

14

believed that any contamination would also have affected the remainder of the duct tape, and the large area swabs of the duct tape had not identified any other male DNA.

The court finds that Professor Hampikian has made a plausible argument to support his position. However, the court does not find that the degree of confidence and certainty Professor Hampikian ascribed to his conclusion is warranted for a number of reasons:

1.     On cross-examination Professor Hampikian was confronted with his opinion in another recent case where he had argued, contrary to his position in this case, that the presence of epithelial DNA on a victim's clothing was not probative of the guilt of the person who matched that DNA.  Specifically, Professor Hampikian had offered opinions for the defense in the Amanda Knox case that DNA from co-defendant Raffaele Sollecito found on the victim's clothing resulted from contamination by Italian law enforcement personnel who had somehow brought the victim's clothing into contact with an item having Sollecito's DNA.

There was at least one acknowledged instance of contamination in this case – the presence in the extract from Item 31F of DNA with a five-locus match to fingerprint analyst Kim Stevens. That contamination involved the same swatch of duct tape that Reese relies on in his new trial motion. The YSTR profile on which Reese relies involves a far smaller trace amount of DNA than the amount which yielded an incomplete DNA profile matching Kim Stevens. See Defendant's Ex. 1 from October 21, 2011 hearing (also offered in evidence at hearing on post-conviction petition) Under these circumstances Professor Hampikian's unwillingness to acknowledge that contamination could also have resulted in the presence of a trace of male DNA in Item 31F casts doubt on his opinion that the YSTR profile could only have come from an alternative perpetrator. The court finds that although Professor Hampikian's hypothesis is

certainly plausible, there is an equally plausible possibility that the YSTR profile resulted from contamination.

2.      Epithelial DNA is DNA contained in skin cells. Unlike DNA from blood or semen – which can be tied to a specific event, a wound or sexual act – epithelial DNA can be transmitted to an item if the item has been touched at any time before, during, or after the events relating to a crime. Thus, the time when the YSTR profile was transmitted to the duct tape could have occurred at any point from the time when the duct tape was purchased, during the time when the roll was handled or used prior to May 26, 2002, during the commission of the crime, during the time from the discovery of the body until the tape was transported to the crime lab, and at any time when the tape was at the crime lab.[14]

3.      Professor Hampikian based his view that the YSTR profile did not result from contamination on the large area swabs of the duct tape – referred to by Professor Hampikian as "substrate control" swabs - that did not yield any DNA other than Cody Green's. The court agrees that in light of those swabs, some of the possible sources of contamination would be unlikely. For instance, Cathy MacMillan agreed during her testimony that the absence of any male DNA on the rest of the duct tape made it unlikely, although not impossible, that the YSTR profile was left by a person who had held the edge of the roll of duct tape.

MacMillan also agreed that if the scissors used to cut the swatch of tape identified as Ex. 31F had been contaminated with male DNA, it would be logical to

---

[14] Epithelial DNA is not always recoverable and may be randomly distributed. Professor Hampikian's theory assumes that the alternative perpetrator was not wearing gloves and that the perpetrator, rather than Cody Green, left the partial print on Item 31F. Except for the DNA from the swatch taken from Item 31F, however, no DNA from anyone other than Cody Green was found anywhere else on the duct tape even though it is certain that Green did not wrap her own wrists and the person who cut or tore off a long strip of tape and then wrapped it four or five times around Green's wrists would necessarily have touched the tape multiple times.

16

assume that the contamination would have been transferred both to the swatch and to the edge from which the swatch was cut. However, there is also the alternative possibility that only one side of the scissor blades was contaminated, and the court cannot find that it is highly probable that if the scissors had been contaminated, this would necessarily have resulted in the deposit of DNA on the remaining duct tape as well as on the swatch that was removed.

In particular, there is a possibility of contamination from the brush used by Kim Stevens in her print analysis. Stevens testified at trial that she applied both super glue and powder to the partial handprint. It is likely that the brush she used would only have been applied to the fingerprint area. If Stevens mistakenly used a brush contaminated with her own DNA and with male DNA from an unknown source, the swatch taken from item 31-F would be contaminated even though no other DNA (except for that of Cody Green) was found in the large area swabs. Accordingly, even though the absence of male DNA on the large area swabs makes some possibilities of contamination unlikely, the large area swabs do not dispel other possibilities of contamination.

4. As noted above, a visual examination of the duct tape (State's Ex. 31) and of the photograph admitted at State's Ex. 24 demonstrates that the area where the print was found was not sealed by an overlying layer of tape.[15] This leaves open a possibility that the YSTR profile was contributed during some contact with the outside of the duct tape after the body was discovered.

---

[15] Although the evidence logs refer to there being six wraps of tape (items 31B through 31G; see inventory filed February 11, 2009), the photograph of body (Ex. 24) demonstrates that at least the "6th wrap" was not in fact wrapped around Cody Green's wrists. Exhibit 24 also demonstrates that smooth side of the "5th wrap" was not covered by an additional layer of tape.

5.      Finally, the court does not accept Professor Hampikian's view that other evidence in the case would not be relevant to whether the partial YSTR profile came from the actual perpetrator of Cody Green's murder.[16] As noted above, considering solely the DNA evidence, Professor Hampikian has presented a plausible argument that the YSTR profile case could have come from the person who wrapped the duct tape around Cody Green's wrists. However, the court also concludes, given the undisputed contamination of item 31F by Kim Stevens's DNA, that there is also a plausible argument that the YSTR profile resulted from contamination. To evaluate the likelihood of each of those possibilities, it is necessary to evaluate the other evidence in the case. If the other evidence strongly implicates Olland Reese, the possibility that the YSTR profile resulted from contamination is increased. This is especially true when the statute requires that the DNA results be considered "with all the other evidence in the case in determining whether a new trial should be ordered." 15 M.R.S. §§2138(10)(A), (B), (C)(1).


7. Consideration of DNA Evidence in Light of the Record as a Whole

Based on the discussion above, the court cannot find by clear and convincing evidence that only the actual perpetrator of the crime could have been the source of the partial YSTR profile on which Reese relies. There is a plausible counter argument that the YSTR profile resulted from contamination. As a result, a new trial cannot be

---

[16] Professor Hampikian had not reviewed all of the trial evidence, but asserted that other evidence in the case would not affect his conclusions. This is understandable given that the institutional mission of the Innocence Project is based on the use of DNA evidence to assist persons who are perceived to have been wrongly accused. However, Maine's DNA statute requires consideration of all the evidence, old and new, in considering whether there is clear and convincing evidence that a different verdict would result. Moreover, in evaluating whether the YSTR profile likely came from the actual perpetrator or likely resulted from contamination, when both possibilities exist, the other evidence must be considered.

ordered under 15 M.R.S. § 2138(10)(A) or (B), both of which would require a finding by clear and convincing evidence that the DNA evidence relied upon by Reese could only have come from the actual perpetrator.

Whether the court grants a new trial, therefore, depends on whether Reese has demonstrated by clear and convincing evidence that the YSTR result, considered with the other evidence in the case, would make it probable that a different verdict would result upon a new trial. 15 M.R.S. §2138(10)(C)(1).[17]

Based on the facts recited at pp. 5-11 above, the court finds that the other evidence against Olland Reese is so strong that the court cannot find by clear and convincing evidence that the partial YSTR profile would make it probable that a different verdict would result upon a new trial.

Reese was the only person at the Bither residence when Cody Green was dropped off by taxi in the late afternoon of May 26, 2002 – the last time she was ever seen alive. Kara McGinnis had gone to work. Reese did not have an automobile. In all his statements, as well as in his testimony at trial, Reese acknowledged that he remained alone at the Bither residence when McGinnis went to work and that he did not leave until McGinnis returned. He was home when McGinnis called him at approximately 5:15. When McGinnis arrived back at the residence at approximately 6:45 p.m., Reese met McGinnis at the door, acting "hyper" and unexpectedly asking for a ride to Wal-Mart. At that time McGinnis observed that the residence – which had been very messy – had been cleaned up and that the sheet on the futon had been removed. That sheet was subsequently found wrapped around Green's body when it was found a

---

[17] If so, the court would also need to consider whether the other requisites of §2138(10)(C) are met in this case.

month later in the woods approximately 125 yards behind the Bither residence, and there was evidence of a track from the burial site toward the residence.

Green died from blunt force trauma to her head. Her blood was found on the futon in the residence, her DNA was found on the hatchet from the residence, and there was a smear of Green's blood in the back hallway of the residence that was consistent with contact with her head as her body was being carried out the back door after she had been killed. All of this evidence strongly supports the conclusion that Green was killed by Reese in the Bither residence, likely from a hatchet blow, during the period when Kara McGinnis was at work.

Further supporting that conclusion are the three different stories Reese offered as to whether he had been at the Bither residence when Green was dropped off by taxi. Neither his story that Green had been dropped off at the residence but left on foot after a few minutes (volunteered to the Brunswick Police before her body was found) nor his story that he had only seen a cab backing out of the driveway (offered after the discovery of her body) makes any sense in view of the presence of Green's blood in the residence and the burial of her body in the woods behind the residence.

Like the jury, the court does not have to choose between the three potential motives for the crime offered by the State at trial: (1) that the murder resulted from Reese's longstanding antipathy to Green; (2) that Green had gone to the Bither residence to get the cocaine she expected or her money back and that an altercation had occurred; or (3) that Reese had made a sexual advance that Green had resisted.[18] Any one of those potential motives, or a combination of several of those motives, would be sufficient to provide a reason for Reese to have murdered Cody Green.

---

[18] There was no evidence of any sexual assault, although when Green's body was found, her trousers were partially unzipped.

The theory that someone other than Reese murdered Cody Green simply cannot account for the timing of the events that occurred on May 26, for Green's disappearance after being dropped off at the Bowdoin residence, for Reese's admitted presence alone at the residence throughout the time when Kara McGinnis was at work, for Green's blood on the futon and in the hallway, for the sheet from the futon wrapped around Green's body, for the absence of that sheet when McGinnis returned to the residence, and for the burial of Green's body in the woods behind the trailer.

In sum, in light of the otherwise overwhelming evidence of guilt and the existence of a plausible basis to conclude that the partial YSTR profile relied upon by Reese resulted from contamination – possibly because Kim Stevens mistakenly used a brush contaminated with male DNA as well as her own DNA – the showing made on the instant motion falls short of clear and convincing evidence that the YSTR profile would probably result in a different verdict. The jury at trial knew that there was a partial print that did not belong to Olland Reese on the duct tape. That was the strongest argument that the defense had available at trial. The jury at trial also knew that an attempt to extract DNA from the area of the fingerprint had resulted in a finding that the sample had been inadvertently contaminated by the State's fingerprint examiner. Evidence of a trace amount of male DNA in that same sample which can be ascribed to further contamination is not sufficient to meet the clear and convincing evidence standard under § 2138(10).

One other point should be made. If press reports of DNA exoneration cases elsewhere in the country are to believed, there are instances where prosecutors and sometimes courts have resisted claims of innocence based on DNA that does not match the defendant even when the remaining evidence against the defendant is doubtful at

best.[19] The court is aware of the possibility that the criminal justice system is overly resistant to overturning results and has carefully considered the evidence in this case in that light. It nevertheless finds that the other evidence against Reese is sufficiently strong that Reese has not shown by clear and convincing evidence that the trace amount of male DNA from the YSTR profile would make it probable that a different verdict would result from a new trial.

The motion for a new trial is denied.

DATED: March _14_, 2012

_____
Thomas D. Warren
Justice, Superior Court

---

[19] The most extreme example would be where a conviction was largely based on a dubious eyewitness identification under bad lighting conditions by someone who saw the perpetrator only briefly and had never seen that person before. In this case Reese's conviction is not based on the kind of evidence that has been found questionable in other cases (cross-racial eyewitness identification, confession under coercive circumstances, etc.).

prod:1.3.1b9/prd11

MAINE JUDICIAL INFORMATION SYSTEM    03/22/2012    aalxnder
SAGADAHOC COUNTY SUPERIOR COURT                    mjxxi013
PAGE A - ATTORNEY BY CASE VIEW

STATE OF MAINE VS OLLAND REESE
UTN:AOCSsr  -2002-0065428                 CASE #:BATSC-CR-2002-00073

-----------------------------------------------------------------------

SEL VD                                    REPRESENTATION TYPE      DATE

01 000008350 ATTORNEY:MACLEAN, CHRISTOPHER K

ADDR:20 MECHANIC STREET CAMDEN ME 04843

   F FOR:OLLAND REESE                              DEF    APPT  03/13/2009

-----------------------------------------------------------------------

02 000006883 ATTORNEY:MACOMBER, DONALD

ADDR:6 STATE HOUSE STATION AUGUSTA ME 04333-0006

   F FOR:STATE OF MAINE                            PL     RTND  05/08/2009